E-FILED on     8/24/05

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| LORI BELTRAN, ROBERT BELTRAN, COBY BELTRAN, by and through his Guardian Ad Litem LORI BELTRAN,,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SANTA CLARA, MELISSA SUAREZ, individually and as an employee of the County of Santa Clara, JENNIFER HUBBS, individually and as an employee of the County of Santa Clara, EMILY TJHIN, individually and as an employee of the County of Santa Clara, DOES 1-50, inclusive,<br><br>Defendants. | No. C-03-03767  RMW<br><br>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>**[Re Docket No. 70]** |

Lori Beltran ("Lori"), Robert Beltran ("Robert") and Coby Beltran ("Coby")[1] (collectively "plaintiffs") sued the County of Santa Clara ("the County"), Melissa Suarez ("Suarez"), Jennifer Hubbs ("Hubbs"), Emily Tjhin ("Tjhin") (collectively "defendants") for civil rights and tort claims. On July 14, 2004 this court granted in part and denied in part defendants' motion to dismiss. On August 27, 2004 plaintiffs filed a first amended complaint ("FAC"). Defendants now seek summary judgment on plaintiffs' remaining

---

[1] Because Lori, Robert, and Coby share the same last name, the court refers to them by their first names. The court intends no disrespect.

claims. Plaintiffs oppose the motion. The court has read the moving and responding papers and considered the arguments of counsel. For the reasons set forth below, the court grants defendants' motion.

## I. BACKGROUND

This case involves child protective proceedings instituted by the County on Coby's behalf. Except as noted, the following facts are undisputed.[2] Plaintiffs claim that Coby has suffered from bowel problems since he was born. FAC ¶ 19. Doctors employ a Body Mass Index ("BMI") to monitor a child's growth. *Id*. at ¶ 20. Plaintiffs allege that Coby has twice fallen below the BMI's "acceptable floor" of the fifth percentile. *Id*. Plaintiffs claim that "all of his life, with the exception of . . . one 15 month period, Coby has had an ongoing cycle of constipation and diarrhea." *Id*. at 21. As a result, doctors inserted a gastrointestinal feeding tube ("G-tube") into Coby. *Id*. at 22. The G-tube allows Lori and Robert to feed "high caloric liquid supplements" to Coby. *Id*. Plaintiffs assert that by the summer of 2002, they had successfully weaned Coby from five cans of supplement per day to about one can per day. *Id*. at 23.

During the first four years of Coby's life, the County investigated four allegations that Lori was abusing Coby. *Id*. at 26. Each referral claimed that Lori suffered from Munchausen Syndrome by Proxy. *Id*. Munchausen Syndrome by Proxy "is a condition characterized by a parent (usually the mother) who takes affirmative steps to keep her child ill, in order to garner medical attention." *Id*. at 26 n.1. The County ultimately dismissed each referral as "unfounded." *Id*. at 26.

On July 9, 2002 Dr. Suzanne Frank ("Dr. Frank"), Coby's pediatrician, informed the Santa Clara County Department of Family and Children's Services ("the DFCS") that she believed that Lori was falsely claiming that Coby was sick. Suarez Decl. Supp. Mot Summ. J. ("Suarez Decl.") ¶ 3. According to Dr. Frank, Lori had solicited money, computers, and other resources on Coby's behalf. *Id*. The County assigned Suarez, a social worker, to the case. *Id*. Suarez interviewed Dr. Frank, who stated that she could not rely on Lori to provide accurate information about Coby's health and that Lori engaged in "doctor shopping." *Id*. at ¶ 3. Suarez also interviewed Dr. Michael Durant ("Dr. Durant"), Coby's gastroenterlogist at Kaiser Medical Center ("Kaiser"). *Id*. at ¶ 5. Dr. Durant suggested that the County hospitalize Coby for

---

[2] Unfortunately, plaintiffs failed to include a statement of facts in their opposition brief. *See* N.D. L.R. 7-4(a)(4) ("a brief or memorandum of points and authorities filed in . . . opposition to a motion must contain . . . [a] succinct statement of the relevant facts"). The court thus divines plaintiffs' view of the case from allegations in the complaint and declarations filed in support of the opposition. The court notes that, by so doing, it does not deem any of the complaint's allegations established.

a week and allow Lori only limited access to him. *Id*. Finally, Suarez spoke to Dr. Oren Abramson ("Dr. Abramson"), Coby's former gastroenterologist at Kaiser, who stated that (1) Coby's G-tube was unnecessary, (2) Lori interfered with his staff when Coby was hospitalized, and (3) he believed that Lori went to several doctors in the hopes of finding something wrong with Coby. *Id*. at ¶ 4.

On August 12, 2002 the DFCS filed a warrant petition with the juvenile court. *Id*. at ¶ 8. The juvenile court issued a protective-custody warrant. On August 14, 2002 the County took Coby into custody. Suarez claims that Coby said he was hungry during the ride to the Santa Clara County Children's Shelter ("the shelter"). *Id*. at ¶ 10. Suarez asserts that her involvement with the case ended when Coby was admitted to the shelter. *Id*. at ¶ 11.

On August 15, 2002 the County assigned Hubbs to the case. Hubbs Decl. Supp. Mot. Summ. J. ("Hubbs Decl.") ¶ 3. Hubbs met with Coby, Lori, and Robert. *Id*. Lori and Robert said that Coby was "starting to make progress" before entering the shelter. *Id*. Dr. Durant, however, stated that he thought that Coby was not doing better and that Lori had left a voice message on August 12 saying that Coby was getting worse. *Id*. On August 16, Hubbs signed a Dependency Initial Hearing Report. *Id*. at ¶ 4. The report stated that Coby was being detained, in part, because "both parents have denied the allegations to this worker, and indicated that they have consistently followed the advice of the medical professionals involved with Coby's treatment." *Id*. Tjhin, as Hubbs' supervisor, signed the warrant petition and reviewed Hubbs' recommendations. Tjhin Decl. Supp. Mot. Summ. J. ("Tjhin Decl.") ¶¶ 5-8.

On August 19, the juvenile court held an initial detention hearing. The court concluded that (1) the County had made a *prima facie* showing that Coby fell within Welfare and Institutions Code section 300[3] ("section 300") and (2) there was no reasonable means by which Coby's physical or emotional health could be protected without removing him from his parents' physical custody. *Id*. at ¶ 5. The court ordered the shelter to detain Coby pending a jurisdictional trial that would begin on August 26. While Coby was in the shelter, plaintiffs claim that Suarez, Hubbs, and Tjhin "authorized, acquiesced . . . or ratified immediate cessation of the G-tube feedings." FAC ¶ 39. Plaintiffs assert that defendants did not consult with Lori or

---

[3] Section 300 states that "a child . . . is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court" when, *inter alia*, "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." Cal. Wel. & Inst. Code § 300(a).

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT—C-03-03767-RMW
DOH                                                                3

1  Robert before making this decision. *Id*. Plaintiffs allege that this decision constituted a "medical trial": an
2  "experiment with how [Coby] would tolerate not having any G-[t]ube supplemental feeds" in an effort "to
3  vindicate the position that Coby's medical problems were 'social' in origin and related to his mother, rather
4  than some physical etiology." *Id*. at ¶¶ 40, 52. Plaintiffs also argue that defendants took Coby to doctor's
5  appointments and administered inoculations without notifying Lori or Robert. *Id*. at ¶¶ 41-42. Plaintiffs
6  claim that Coby lost somewhere between 2.6 and 5 pounds while he was in the shelter. *Id*. at 43.
7  However, both Tjhin and Hubbs deny being involved in any of the medical decisions relating to Coby.
8  Tjhin Decl. ¶ 10; Hubbs Decl. ¶ 11. Hubbs also stated that she "made every effort [to] . . . inform Lori and
9  Robert" of Coby's appointments. Hubbs Decl. ¶ 11.
10         On August 22, Hubbs signed a jurisdictional report summarizing her investigation and
11 recommending that Coby be made a dependent of the court. *Id*. In the report, Hubbs noted that agencies
12 in South Carolina and Minnesota had issued child abuse referrals with respect to Lori's other children. *Id*.
13 at ¶ 7. Hubbs also attached a contract that Kaiser required Lori to sign that stated that she would "not
14 harass or intimidate the nursing staff and other caregivers" or "interfere with the care by the nursing staff."
15 *Id*. A month-long juvenile dependency trial ensured. During the trial, Hubbs testified numerous times.
16 Hubbs Decl. ¶ 13. Plaintiffs allege that Hubbs "attempt[ed] to paint an idyllic picture of life for Coby in the
17 shelter," and thus committed fraud and perjury. FAC ¶ 44. Plaintiffs contend that Hubbs refused to place
18 Coby with Robert's parents during this time in order to "keep Coby in the shelter so that the medical trial
19 . . . could continue." *Id*. at ¶ 52.
20         On September 16, 2002 the juvenile court found that Coby should not remain in protective custody
21 during the jurisdictional hearing. Transcript, Kiniyalocts Decl. Supp. Mot. Summ. J. ("Kiniyalocts Decl.")
22 Ex. V at 1803:8-16. The court released Coby to Lori and Robert. *Id*. at 1083:17-27. On September 30,
23 the court held that DFCS had not proven its case by a preponderance of the evidence. *Id*. at 2419:19-22.
24 Dismissing the complaint, the court chastised the DFCS:
25     Now the court would also like to add not as a finding of fact but rather as a simple
       expression of concern that the [DFCS] proceeded with this dependency action without
26     undertaking any real independent investigation. The treating physician's statements were
       taken at face value.
27
28

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT—C-03-03767-RMW
DOH                                                          4

1  *Id*. at 2418:28-2419:6.

2  On August 12, 2003 plaintiffs filed a complaint in this court. Defendants filed a motion to dismiss.
3  On July 14, 2004 this court dismissed several of plaintiffs' causes of action. However, the court denied
4  defendants' motion to dismiss plaintiffs' claims with respect to Coby's medical treatment. The court did not
5  foreclose the possibility that plaintiffs would prove that defendants had violated plaintiffs' clearly-established
6  constitutional rights:

> Defendants also note that the juvenile court has a standing order authorizing routine medical and dental treatment for children in placement. It remains unclear, however, what medical examinations were performed on Coby, and whether these examinations were made pursuant to the standing order. If the only medical examinations performed on Coby were made pursuant to statute or court order, then there is no constitutional violation. Even if certain examinations or inoculations were not performed pursuant to statute or court order, plaintiffs must still show that it would have been clear to a reasonable social worker in the position of either Suarez, Tjhin or Hubbs that their actions were unlawful. Without knowing the exact nature of what medical examinations or procedures were performed and who authorized them, however, the court cannot make a determination of qualified immunity.

13  July 14 Order at 11:21-12:5. The court also denied defendants' motion to dismiss plaintiffs' claims relating
14  to Hubbs' conduct during the dependency hearing. *Id*. at 9:2-9.

15  On August 27, 2004 plaintiffs filed the FAC. The FAC alleges that (1) Hubbs violated plaintiffs'
16  Fourteenth Amendment rights to familial association by detaining Coby rather than placing him with his
17  grandparents, FAC ¶¶ 61-65, (2) Tjhin and Hubbs[4] violated Coby's "right to privacy in his body" and Lori
18  and Robert's right to familial association by performing the "medical trial" and not giving Lori or Robert
19  notice of Coby's examinations and inoculations, FAC ¶¶ 66-69, and (3) Tjhin and Hubbs intentionally
20  inflicted emotional distress upon plaintiffs. FAC ¶¶ 76-81.[5]

### III. ANALYSIS

**A.   Qualified Immunity and Summary Judgment**

Section 1983 "creates a private right of action against individuals who, acting under color of state law, violate federal constitutional or statutory rights." *Squaw Valley Development Co. v. Goldberg*, 375

---

[4]   Plaintiffs apparently do not dispute that Suarez's involvement with Coby's case ended when Coby was admitted to the shelter on August 14, 2002. *See* Opp. Mot. Summ. J. at 14:1-10 (not mentioning Suarez). Thus, because plaintiffs do not contend that Suarez caused a deprivation of their constitutional rights, she is entitled to summary judgment on their section 1983 claims.

[5]   Plaintiffs also alleged a cause of action for battery against Suarez, Tjhin, and Hubbs. FAC ¶¶ 70-75. However, plaintiffs now concede that the court should dismiss their battery claims because the individual defendants "did not personally offensively touch . . . Coby." Opp. Mot. Summ. J. at 30:5-8.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT—C-03-03767-RMW
DOH                                                          5

1  F.3d 936, 943 (9th Cir. 2004) (quoting *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) (en

2  banc)).[6] To prevail on their section 1983 claims, plaintiffs "must demonstrate that (1) the action occurred

3  'under color of state law' and (2) the action resulted in the deprivation of a constitutional right or federal

4  statutory right." *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). The doctrine of qualified immunity

5  shields defendants in section 1983 actions from liability if "their conduct does not violate clearly established

6  statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*,

7  457 U.S. 800, 818 (1982). The United States Supreme Court has instructed district courts to "determine

8  first whether the plaintiff has alleged a deprivation of a constitutional right at all." *County of Sacramento v.*

9  *Lewis*, 523 U.S. 833, 842 n.5 (1998). The court must therefore "consider the materials submitted in

10 support of, and in opposition to, summary judgment, in order to decide whether a constitutional right would

11 be violated if all facts are viewed in favor of the party opposing summary judgment." *Jeffers v. Gomez*,

12 267 F.3d 895, 909 (9th Cir. 2001). If the court finds that no constitutional violation occurred, "the inquiry

13 ends." *Cunningham v. City of Wenatchee*, 345 F.3d 802, 810 (9th Cir. 2003). However, if "the parties'

14 submissions create a triable issue of whether a constitutional violation occurred, the second question is

15 'whether the right was clearly established.'" *Squaw Valley*, 375 F.3d at 943 (quoting *Saucier v. Katz*, 533

16 U.S. 194, 201 (2001)). A right is "clearly established" when "it would be clear to a reasonable [defendant]

17 that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

18      **B.    Substantive Due Process and Fourth Amendment Claims**

19      Plaintiffs first claim that Tjhin and Hubbs violated their constitutional rights. The Due Process

20 Clause of the Fourteenth Amendment forbids states from "depriv[ing] any person of life, liberty, or

21 property, without due process of law." U.S. Const. Amend. XIV. "Historically, this guarantee of due

22 process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty,

23 or property." *Daniels v. Williams*, 474 U.S. 327, 331 (1986) (emphasis in original). Substantive due

24 process rights guard against government arbitrariness: its "exercise of power without any reasonable

25 justification in the service of a legitimate governmental objective." *Sacramento*, 523 U.S. at 846. "[O]nly

26 the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *Id*. (citation

---

[6] Section 1983 states that "every person who, under color of any statute, ordinance, regulation, custom, or usage" subjects another "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT—C-03-03767-RMW
DOH                                        6

omitted). Accordingly, state action must "shock the conscience" to be actionable and "'mere negligence' . . . is not sufficient to trigger the substantive due process protections of the fourteenth amendment." *Redman v. County of San Diego*, 896 F.2d 362, 365 (9th Cir. 1990). Here, the parties agree that defendants must have exhibited "deliberate indifference" toward plaintiffs to have violated their constitutional rights. *Cf. Nicini v. Morra*, 212 F.3d 798, 811 (3d. Cir. 2000) (applying deliberate indifference standard to issue of whether social worker violated foster child's substantive due process rights by letting him stay in an allegedly abusive household); *Redman*, 896 F.2d at 395 (applying deliberate indifference standard to issue of whether jail officials violated pretrial detainees' substantive due process rights).

Coby claims that Tjhin and Hubbs violated his right to privacy under the Fourth Amendment by subjecting him to the medical trial, appointments, and inoculations.[7] In addition, plaintiffs claim that Hubbs violated their Fourth Amendment rights by continuing to detain Coby in the shelter instead of placing him with Robert's parents. The Fourth Amendment protects against "unreasonable searches and seizures" and provides that "no [w]arrants shall issue, but upon probable cause . . . ." U.S. Const. Amend. IV. "In the context of a seizure of a child by the [s]tate during an abuse investigation . . . a court order is the equivalent of a warrant." *Tenenbaum v. Williams*, 193 F.3d 581, 603 (2d Cir. 1999). The Ninth Circuit "applie[s] the same legal standard in evaluating Fourth and Fourteenth Amendment claims" involving the removal of children. *Doe v. Lebbos*, 348 F.3d 820, 827 n.9 (9th Cir. 2003). Thus, the court will apply the "deliberate indifference" standard to all of plaintiffs' constitutional claims. The court considers each in turn.

### 1. Continued Detention of Coby and Failure to Place Him With His Grandparents

Plaintiffs assert that Hubbs and Tjhin violated their Fourteenth Amendment rights to familial association by detaining Coby in the shelter instead of turning him over to Robert's parents. FAC ¶¶ 51-53, 61-65. Plaintiffs acknowledge that the juvenile court ordered Coby's detention, but contend that the court's conclusion was unreasonable:

> Indeed, the fact that a *prima facie* case *had not been made by September 16, 2002*, some 10 trial days in . . . after 9 witnesses (including a treating physician, prior social workers involved with the family, defendants, Hubbs, Suarez, the 'expert' for DFCS . . . and a significant number of documents being introduced, begs . . . no, *shouts the question*,

---

[7] Plaintiffs also assert that defendants violated Coby's First Amendment rights. Opp. Mot. Summ. J. at 26:6. However, plaintiffs fail to back this conclusory assertion with factual or legal arguments. The court thus grants summary judgment in defendants' favor on plaintiffs' First Amendment claims.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT—C-03-03767-RMW
DOH
7

> how is it that a '*prima facie*' case had been made [on] August 19, 2002, at the detention hearing?

Opp. Mot. Summ. J. at 10 n.4 (emphasis in original). Nevertheless, even if plaintiffs are correct, they offer no evidence that Hubbs or Tjhin were deliberately indifferent to their constitutional rights. California law entrusts the juvenile court—not social workers—with the decision whether to release a child. *See* Cal. Welf. & Inst. Code § 319(b) (requiring juvenile courts "order the release of [a] child from custody unless a *prima facie* showing has been made" that the child is in danger). Because plaintiffs fail to prove that Hubbs or Tjhin had any power to alter the juvenile court's conclusion that Coby should be detained, the court grants defendants' motion for summary judgment on this aspect of plaintiffs' claims.[8]

### 2. Medical Decisions During Coby's Detention

Plaintiffs argue that Tjhin and Hubbs violated their constitutional rights by ordering shelter personnel to stop feeding Coby through the G-tube. FAC ¶ 39. Plaintiffs allege that Tjhin and Hubbs did so to try to prove that Coby's "medical problems were 'social' in origin and related to his mother, rather than some physical etiology." *Id*. at ¶ 40. Plaintiffs also assert that shelter personnel inoculated Coby without Lori and Robert's consent. Powell Decl. Ex. 12.

Plaintiffs rely on *Wallis*, 202 F.3d at 1126. In that case, young children and their parents sued police officers from the city of Escondido who removed the children from their parents' home based on a single allegation that the Ninth Circuit aptly described as "fantastic": a mental patient's statement that the father "was planning to sacrifice his young son . . . to Satan at the 'Fall Equinox ritual.'" *Id*. at 1131. Without obtaining a court order or notifying the parents, an officer "ordered, on behalf of the Escondido Police Department, an evidentiary physical examination of both children." *Id*. at 1135. At the time of the examinations, child protective services had not determined whether to seek custody of the children. *Id*. at 1133. Reversing the district court's grant of summary judgment in defendants' favor, the Ninth Circuit held that the plaintiffs had raised genuine issues of material fact that the examinations violated their Fourth and Fourteenth Amendment rights:

---

[8] Plaintiffs cite *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000) for the proposition that "a juvenile court referee's . . . temporary order to detain children [i]s not a bar to a subsequent civil rights action." Opp. Mot. Summ. J. at 12:10-12. The court agrees that the fact that the juvenile court initially detained Coby, standing alone, does not exonerate Tjhin or Hubbs from liability for any subsequent constitutional violation.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT—C-03-03767-RMW
DOH                                                          8

> We agree with the Second Circuit which held, in *van Emrik v. Chemung County Dept. of Social Servs.*, that the 'Constitution assures parents that, in the absence of parental consent, [physical examinations] of their child may not be undertaken for investigative purposes at the behest of state officials unless a judicial officer has determined, upon notice to the parents, and an opportunity to be heard, that grounds for such an examination exist and that the administration of the procedure is reasonable under all the circumstances.'

*Id*. at 1141 (quoting *van Emrik*, 911 F.2d 863, 867 (2d Cir. 1990) (alterations supplied by *Wallis*).

However, unlike *Wallis*, where it was undisputed that the defendants actually ordered the medical procedures at issue, plaintiffs here have no evidence that Tjhin or Hubbs were responsible for examining and inoculating Coby or discontinuing his G-tube feedings. Tjhin and Hubbs assert that they "did not direct or authorize any medical treatment provided to Coby" because "[c]hildren who are placed in the [s]helter receive medical care in accordance with directives from doctors." Tjhin Decl. ¶ 10, Hubbs Decl. ¶ 11. In fact, "[w]hile Coby was in protective custody at the shelter, his treating doctors at Kaiser were responsible for directing Coby's treatment." Graber Decl. Supp. Mot. Summ. J. ("Graber Decl.") ¶ 3. Thus, it is undisputed that Dr. Durant, Dr. Frank, and Dr. Abramson—who Coby had been seeing before entering protective custody—directed his medical care while he was in the shelter. Albin Decl. Supp. Mot. Summ. J. ("Albin Decl.") ¶ 4.[9] On August 14, 2002, the date that the County took Coby into protective custody, Dr. Durant wrote to Suarez and recommended that Coby "receive regular thrice daily meals of a healthy, well-balanced diet." Kiniyalocts Decl. Ex. E. Thus, it was Dr. Durant, and not Tjhin or Hubbs, who ordered the discontinuation of Coby's G-tube feedings.

This fact dooms plaintiffs' constitutional claims with respect to medical decisions during Coby's detention. For one, plaintiffs fail to link Tjhin and Hubbs to the alleged constitutional violations. *See Mabe v. San Bernardino County, Dept. of Public Social Services*, 237 F.3d 1101, 1109 (9th Cir. 2001) (affirming district court's grant of summary judgment where "no evidence was presented to show a causal connection between any personal conduct by [defendant] and the alleged constitutional violation"). In addition, plaintiffs fail to allege a constitutional violation at all: indeed, Dr. Durant, Dr. Frank, and Dr. Abramson are private individuals, not state actors. *See DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 195 (1989) ("nothing in the language of the Due Process Clause itself requires the [s]tate to protect the life, liberty, and property of its citizens against invasion by private actors"); *Walter v.*

---

[9] Defendants assert—and plaintiffs do not contradict—that this was in accord with the shelter's policy of permitting children who already have physicians to continue to see them "to ensure continuity in their care." Graber Decl. ¶ 3.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT—C-03-03767-RMW
DOH
9

1  *U.S.*, 447 U.S. 649, 656 (1980) ("a wrongful search or seizure conducted by a private party does not
2  violate the Fourth Amendment").  Thus, plaintiffs' lack of evidence that Tjhin or Hubbs were personally
3  responsible for Coby's medical care is fatal to their claims.

4  Plaintiffs argue that Tjhin and Hubbs fall within two exceptions to the rule that public officials cannot
5  be liable for private individuals' constitutional violations: the "state-created danger" and "special relationship"
6  doctrines.  First, plaintiffs cite *K.H. v. Morgan*, 914 F.2d 846 (7th Cir. 1990) and *Aristotle P. v.*
7  *Johnson*, 721 F. Supp. 1002 (N.D. Ill. 1989) for the proposition that "[a] government actor may not place
8  a child in danger."  Opp. Mot. Summ. J. at 13:12-21.  Plaintiffs contend that because Tjhin knew that other
9  parents had recently sued the County for allegedly inoculating their children in the shelter without notifying
10 them, Tjhin Depo. at 56:4-9, Tjhin permitted Coby to be placed in peril.  Plaintiffs also contend that the
11 juvenile court ruled that "[p]lacement and care of [Coby is] temporarily vested with the [DFCS]."  Powell
12 Decl. Ex. G.  In light of the juvenile court's order, plaintiffs assert that Hubbs, Coby's assigned social
13 worker, should be liable for any subsequent constitutional deprivations that he suffered.  Second, plaintiffs
14 contend that Tjhin and Hubbs are liable by virtue of their "special relationship" with Coby.  In *Nicini*, the
15 plaintiff sued the New Jersey Department of Human Services, Division of Youth and Family Services
16 ("DYFS") alleging that he had been molested by a person with whom he had been staying while in DYFS
17 custody.  The Third Circuit held that "when the state places a child in state-regulated foster care, [it] has
18 entered into a special relationship with that child which imposes upon it certain affirmative duties."  *Nicini*,
19 212 F.3d at 808.  Because there was evidence that the DYFS "acquiesced" to plaintiff staying with alleged
20 molester, the court held that the DYFS could be liable under section 1983.  *Id*. at 810.

21 Plaintiffs' arguments lack merit.  Under both the "state-created danger" and "special relationship"
22 doctrines, courts find social workers liable for engaging in some act or omission *after* taking custody of the
23 plaintiff.  For example, the plaintiff in *K.H.* contended that defendants had placed her in an abusive foster
24 home.  *K.H.*, 914 F.2d at 848.  Likewise, *Nicini* featured a social worker who allegedly failed to
25 investigate the individual with whom he knew plaintiff was staying.  *Nicini*, 212 F.3d at 814-15.  Here,
26 though, the allegedly unconstitutional conduct that forms the basis of plaintiffs' "state-created danger" and
27 "special relationship" theories *is* taking Coby into custody.  Plaintiffs assert that Tjhin and Hubbs should be
28 responsible for "allow[ing] Coby to be placed" in the shelter where they "knew [that] he could receive
   unauthorized and unlawful" medical care.  Opp. Mot. Summ. J. at 14:7-10.  The court has already held that

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT—C-03-03767-RMW
DOH                                                         10

Tjhin is absolutely immune for signing the warrant petition placing Coby in protective custody. July 14 Order at 8:7-13. Although plaintiffs did not contend that Hubbs was liable for placing Coby in protective custody, Ninth Circuit precedent forecloses any such claim. *See Miller v. Gammie*, 335 F.3d 889, 898 (9th Cir. 2003) (en banc) ("the critical decision to institute proceedings to make a child a ward of the state is functionally similar to the prosecutorial institution of a criminal proceeding" and is thus entitled to absolute immunity). Thus, because neither Tjhin nor Hubbs can be liable for their initial decision to place Coby in the shelter, plaintiffs' "state-created danger" and "special relationship" theories fail.

In any event, the "state-created danger" and "special relationship" exceptions would not apply to the facts of this case. Both doctrines require a state actor to ignore clear indications of a private actor's dangerous propensity. For example, in *K.H.*, the Seventh Circuit held that a trial court properly denied a motion to dismiss allegations that social workers placed a child in an abusive foster home. *K.H.*, 914 F.2d at 848. The court construed the complaint to allege that the social workers violated the plaintiff's substantive due process rights "by deliberately and without justification placing children with foster parents having a known propensity to neglect or abuse children." *Id*. at 852.[10] Defendants here did far less. Plaintiffs' sole contention that defendants placed Coby in danger is that Tjhin was aware of another lawsuit against the County for allegedly inoculating children without parental consent.[11] Of course, entrusting children to known abusers creates a far more serious risk than placing children in a shelter that has previously been sued.[12] Similarly, *Nicini* ultimately granted summary judgment in favor of the social worker despite allegations that he failed to investigate the alleged abuser, an individual about whom others were "suspicious." *See Nicini*, 212 F.3d at 814-15. *Nicini* thus reveals that even when a "special relationship" exists between the plaintiff and defendant, the defendant will not be liable unless he fails to recognize clear

---

[10]   *Aristotle*, on the other hand, involved a challenge to the Illinois child protective services' practice of placing siblings in separate foster homes, and is wholly inapposite. *See Aristotle*, 721 F. Supp. at 1004.

[11]   Plaintiffs provide no evidence that this other lawsuit (1) involved similar constitutional issues or (2) had merit.

signs that a private actor is likely to violate the plaintiff's constitutional rights. Because plaintiffs fail to show that Thjin or Hubbs recognized such clear signs, defendants are entitled to summary judgment.

### 3. Failing to Notify Lori or Robert About Coby's Medical Appointments, Inoculations, or the Cessation of G-tube Feedings

Plaintiffs argue that Tjhin and Hubbs violated their constitutional rights by "repeated failures to tell [Lori and Robert] of . . . planned medical evaluations or examinations." Opp. Mot. Summ. J. at 18:14-16. Specifically, plaintiffs contend that on two occasions, Hubbs did not tell Lori and Robert that Coby was going to visit a doctor. Powell Decl. ¶ 5. In addition, Lori and Robert claim that they were "never informed . . . that Coby was going to be subjected to a cessation of feeding through his G-Tube prior to it occurring . . . or that Coby was going to receive any immunizations or inoculations while in the shelter." Lori Decl. ¶¶ 17, 18; Robert Decl. ¶¶ 3, 4.

Plaintiffs again rely on *Wallis*. In *Wallis*, the court recognized that the constitution forbade police officers from subjecting two young children to "invasive vaginal and medical examinations" without notifying their parents:

> [T]he state is required to notify parents and to obtain judicial approval before children are subjected to investigatory physical examinations. [¶]. Moreover, parents have a right arising from the liberty interest in family association to be with their children while they are receiving medical attention (or to be in a waiting room or other nearby area if there is a valid reason for excluding them while all or a part of the medical procedure is being conducted). Likewise, children have a corresponding right to the love, comfort, and reassurance of their parents while they are undergoing medical procedures, including examinations—particularly those, such as here, that are invasive or upsetting.

*Wallis*, 202 F.3d at 1141-42.[13]

At first blush, *Wallis* appears to support plaintiffs' claims. *Wallis* seems to establish two constitutional rights: (1) the right of parents to receive notice before their "children are subjected to investigatory physical examinations" and (2) the right of parents and children to be together "while [the children] are receiving medical attention." *Id*. However, *Wallis* cannot stand for the proposition that parents and children have an unqualified right to be together during all state-initiated medical procedures. It is well-established that parents only have a right to receive notice before their children undergo

---

[13] Defendants argue that this court's July 14 Order foreclosed this claim by ruling that "there is no constitutional violation" if "the medical examinations performed on Coby were made pursuant to statute or court order." July 14 Order at 12:1-3. The court disagrees. The issue of whether defendants violated plaintiffs' rights by failing to inform them about Coby's appointments is different from whether defendants violated plaintiffs' rights by actually conducting medical examinations.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT—C-03-03767-RMW
DOH                                                         12

"investigatory physical examinations." *See Chayo v. Kaladjian*, 844 F. Supp. 163, 170 (S.D. N.Y. 1994) (granting motion for summary judgment on claim that social workers unconstitutionally administered X-ray examinations to children when the exams "for medical rather than investigative purposes"); *Schwimmer v. Kaladjian*, 988 F. Supp. 631, 641 (S.D. N.Y. 1997) (granting motion for summary judgment on claim that social workers unconstitutionally took skeletal X-rays of children where "the record is devoid of evidence that [the X-rays were] for investigatory purposes and that the [X]-rays were 'not medically necessary or advisable'); *Doe*, 348 F.3d at 828 (reading *Wallis* to forbid "intrusive sexual abuse examination[s] without parental consent or a court order"). If parents do not have the right to receive *notice* before the state initiates non-investigatory, non-intrusive medical examinations, then it would be perverse to require the state to ensure that parents are "*with* their children" during such procedures. *Wallis*, 202 F.3d at 1142 (emphasis added). In fact, *Wallis*'s reasoning does not support extending the right of parents and children to be together to routine medical procedures. *Wallis* noted that recognition of such a right is necessary "because of the possibility that a need to make medical decisions will arise, and in part because of the family's right to be together during such difficult and often traumatic events." *Id*. Routine medical examinations are far less likely to give rise to spur-of-the-moment, important medical decisions or to cause severe trauma. The court thus reads *Wallis* to recognize that parents and children have a constitutional right to be together only during intrusive or investigatory physical examinations.[14]

Here, plaintiffs offer no evidence that defendants failed to inform them about any intrusive or investigatory examination. Instead, plaintiffs assert that defendants failed to inform them about routine medical procedures: (1) "an inoculation that . . . cause[d] Coby's upper arm to swell up and a rash to develop," Lori Beltran Special Interog. Resp. ("Special Rogs") No. 6, Kiniyalocts Decl. Ex. W and (2) "two or three medical appointments Coby was taken to [sic] which we found out about after they occurred . . . ." Special Rogs No. 7. Moreover, plaintiffs offer no evidence that Hubbs exhibited deliberate indifference to plaintiffs' constitutional rights. First, Hubbs' conduct was consistent with the shelter's

---

[14] In any event, *Wallis* involved highly-intrusive investigatory examinations. Thus, any suggestion that parents and children enjoy a broader right to be together during all medical procedures is *dicta*.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT—C-03-03767-RMW
DOH                                                               13

1  standing order.[15]  In addition, the evidence supports Hubbs' claim that she "made every effort to ensure that

2  [she] was informed of all of Coby's medical appointments so that [she] could inform Lori and Robert . . . of

3  such appointments."  Hubbs Decl. ¶ 11.  In fact, Hubbs sent a memorandum to the shelter "remind[ing]

4  everyone that it is very important that [she] be notified when Coby . . . has any medical appointments."

5  Kiniyalocts Decl. Ex. O.  Plaintiffs' claims with respect to the inoculations and doctor's appointments thus

6  fail.

7       Second, the court does not believe that *Wallis* requires defendants to notify Lori and Robert

8  before feeding Coby solids instead of liquid through his G-tube.  The manner in which defendants fed Coby

9  is simply not an "investigatory physical examination."  For one, *Wallis* stems from a desire to avoid

10  subjecting children to intrusive and painful procedures.  *See Wallis*, 202 F.3d at 1141 n.11 ("[i]t does not

11  require a constitutional scholar to conclude that a nude search of a thirteen-year-old child is an invasion of

12  constitutional rights of some magnitude") (citation omitted).  But the challenged conduct here is nothing

13  more than treating Coby like other children in the shelter.  This creates far less potential for physical or

14  mental trauma than the cavity search in *Wallis*.  Moreover, despite Lori and Robert's unsubstantiated claims

15  to the contrary, it appears that Dr. Durant ordered shelter personnel to feed Coby solids for therapeutic,

16  rather than investigatory reasons.  For example, Dr. Durant testified during the dependency hearing that

17  feeding Coby solids and forcing him to try to defecate is a "proven treatment for behavioral disorders in

18  children such as severe fecal withholding."  Kiniyalocts Decl. Ex. LL at 2030:10-21.  Thus, because Lori

19  and Robert had no constitutional right to receive notice before shelter personnel fed Coby solid food,

20  defendants are entitled to summary judgment.

21          **4.       Hubbs' Conduct During the Dependency Hearing**

22                  **i.       "Hiding" James Dunn**

23       James Dunn ("Dunn"), Lori's ex-husband, lives in Louisiana.  Opp. Mot. Summ. J. at 22:20.  Lori

24  and Dunn have a child named Brandon.  Dunn Decl. Opp. Mot. Summ. J. ("Dunn Decl.") ¶ 1.  The DFCS

25  flew Dunn to California during the juvenile dependency trial.  Dunn Decl. ¶ 2.  Although the DFCS brought

26  Dunn into the courthouse while the trial was in progress, he did not testify.  *Id*.  Plaintiffs argue that they did

---

28  [15]   The standing order allows the DFCS to give "[a] comprehensive health assessment and physical examination" and "[l]imited, non-intrusive diagnostic tests that the physician determines are necessary for evaluation of the minor's health status" but requires "appropriate legal consent, or a court order" for "invasive diagnostic and clinical tests."  Kiniyalocts Decl. Ex. T at 1(a)-(b) & 3(a).

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT—C-03-03767-RMW
DOH                                                    14

1  not learn that the DFCS had flown Dunn to California until the discovery phase of this lawsuit. Powell

2  Decl. ¶ 3. During the trial, Hubbs testified that Dunn told her that until Brandon was three years old, Lori

3  "was receiving Social Security or SSI benefits based on Brandon being deaf and mentally retarded," when

4  "neither of those conditions existed." Transcript, Powell Decl. Ex. 2 ("Tr.") at 1171:7-11. Plaintiffs claim

5  that the DFCS and Hubbs "hid" Dunn because his testimony would have undermined their efforts to cast

6  doubt on Lori's credibility. Plaintiffs argue that Lori had informed Hubbs that Brandon received SSI

7  benefits for a different reason: specifically, because he had been born prematurely. Lori Decl. ¶ 14.

8  Plaintiffs assert that Dunn's testimony would have (1) confirmed that Brandon had been born prematurely

9  and (2) revealed that Dunn had not seen Brandon when he was between the ages of two months to two-

10  and-a-half years old, thus raising questions about how Dunn could have known whether Brandon actually

11  was disabled during this time.

12       Plaintiffs' arguments are unpersuasive. For one, both Hubbs and Tjhin denied making the decision

13  not to call Dunn and stated that "the decision not to call [Dunn] was made after the court ruled that it would

14  not consider any evidence pertaining to [Lori's] other children." Hubbs Decl. Supp. Mot. Summ. J.

15  ("Hubbs Decl.") ¶ 12; Thjin Decl. Supp. Mot. Summ. J. ("Thjin Decl.") ¶ 9. Likewise, Dunn claimed that he

16  was under the impression '[t]hat either the judge was not going to allow [his] testimony or that [his]

17  testimony wasn't needed." Dunn Depo. at 34:12-18. Plaintiffs argue that "the judge most certainly did not

18  say . . . nor is it in the transcript" that the court declined to hear Dunn's testimony. Opp. Mot. Summ. J. at

19  24:1-4. However, plaintiffs' support for this contention is a non-specific citation to their attorney's

20  declaration: "[RRP Decl.]." *Id*. The one paragraph of the declaration that relates to Dunn says nothing

21  about this issue. *See* Powell Decl. ¶ 3. Plaintiffs therefore have no evidence to suggest that defendants

22  made a bad faith effort to suppress Dunn's testimony.[16]

23       In addition, Dunn's testimony would have harmed, not helped, plaintiffs' case. Admittedly, Dunn

24  could have stated that Brandon was born three months prematurely. Dunn Depo. at 37:14-17. As

25  defendants correctly argue, though, plaintiffs did not need to call Dunn to establish this fact. Indeed,

---

[16] Plaintiffs also allege that neither Hubbs nor Tjhin took notes during conversations with Dunn. The court is not sure how plaintiffs believe that this fact reveals that Hubbs or Tjhin were deliberately indifferent to plaintiffs' rights. In any event, Tjhin testified that she did not take notes because she "did not conduct [a] [f]ormal interview with [Dunn]." Tjhin Depo. at 70:16-18. Similarly, Hubbs testified that she did not take notes because she did not conduct "a sit-down interview" with Dunn. Hubbs Depo. at 26:5-18. Thus, there is no evidence that Tjhin or Hubbs' failure to take notes was in bad faith.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT—C-03-03767-RMW
DOH

plaintiffs could have done so by introducing Brandon's medical records into evidence. Moreover, the negative aspects of Dunn's testimony would have overshadowed this slight boon to Lori's credibility. In his deposition, Dunn explained that he and Lori have "a bad history" and that Lori "had lost custody" of Brandon "through the courts in South Carolina." Dunn Depo. at 4:8-11. Dunn also described an incident where Lori "used Brandon and told them that he was mentally retarded and deaf and needed a bicycle for him and had obtained goods from the manager of a local K-Mart using the child." Dunn Depo. at 14:25-15:4. This testimony would have been especially damaging in light of its similarity to Dr. Frank's allegation that "Lori operated a web site on which she requested donations of money and goods for Coby's medical expenses that she later sold on E-Bay." Suarez Decl. Supp. Mot. Summ. J. ("Suarez Decl.") ¶ 3. No reasonable jury could conclude that defendants' conduct with respect to Dunn constituted deliberate indifferent to plaintiffs' constitutional rights.

### ii.    Hubbs' Testimony

Plaintiffs also allege that Hubbs perjured herself during the dependency trial. Plaintiffs claim that, on September 10, 2002, Hubbs testified that Coby was "doing good" in the shelter:

> Q: Is it fair to say that your testimony is that Coby is doing good in the shelter, maybe not good, but certainly not bad. He is at least doing good?
> A: I would say that is a fair assessment, yes.

Tr. at 1143:25-1144:1. Plaintiffs argue that Hubbs' claim was inconsistent with the fact that Coby was experiencing several health problems. As discussed below, plaintiffs' claim lacks merit.

First, plaintiffs note that Coby suffered from granulation—rotting skin—around his G-tube. Powell Decl. Ex. 6. However, on September 9, Dr. Abramson testified during the dependency trial that Coby had granulation before the DFCS took him into custody. Tr. at 878:17-25. Dr. Abramson also testified that granulation is "a frequent occurrence" around G-tubes. Tr. at 864:13-865:2. Because Dr. Abramson had previously opined that Coby's granulation was a pre-existing and (unfortunately) common problem, plaintiffs fail to show that Hubbs tried to hide Coby's granulation from the juvenile court.

Plaintiffs also contend that Coby told Lori that he had acid reflux in the shelter. Lori Decl. ¶ 15. However, plaintiffs have no evidence that Coby communicated this fact to anyone at the shelter, let alone Hubbs. In addition, plaintiffs assert that Coby was not exhibiting a normal stooling pattern. Yet Hubbs acknowledged this problem, testifying that "[m]y understanding [is that] the stools have been loose, and the concern [is that] he was having too much laxative . . . ." Tr. at 1152:20-21. Hubbs' admission that Coby's

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT—C-03-03767-RMW
DOH                                                          16

bowel patterns were irregular belies plaintiffs' argument that she tried to mislead the court into believing that Coby was "doing good [sic]."

Similarly, plaintiffs allege that Hubbs tried to hide that Coby (1) suffered from vomiting, diarrhea, a cold, headaches, and diaper rash, (2) was being prompted to eat, and (3) had lost weight since entering the shelter. But Hubbs actually testified about the majority of these issues:

> Q: What was the outcome of the evaluation?
> A: I believe that the concern was that he was having diarrhea, he might be on too much laxative. They reduced his dosage, I believe they actually eliminated it, but I'm not completely certain.
> Q: And he a cold too, didn't he?
> A: Correct.
> \*\*\*
> Q: Was there one incident in which he woke up and vomited?
> A: I believe, I don't know if it was the same incident as a bad dream. There was one time that he vomited.
> \*\*\*
> Q: What has happened recently?
> A: Recently I requested that we have a one-to-one shelter staff help him around the eating time so that someone could encourage him to eat because, as the parents have pointed out as you have pointed out, he is somebody that I would consider a child that needs assistance continuing to eat . . . . That was in response to a conversation with Dr. Albin and the other doctors about how want to try to do other things besides immediately start feeding him with the G-tube because he had had some weight loss . . . .

Tr. at 1229:21-27, 1707:20-22, 1273A:21-26.

Finally, Hubbs' brief, cautious statement is hardly a ringing endorsement of Coby's well-being. Matters might be different if Hubbs had falsely denied that Coby was suffering from specific maladies. But the question at issue—whether Coby is "maybe not good . . . certainly not bad [but]    . . . at least doing good"—invited a highly general response. Indeed, Hubbs qualified her reply by agreeing that counsel's statement was "a fair assessment." In addition, counsel's question called for Hubbs' opinion, not for a statement of empirical fact. Just because plaintiffs and Hubbs may disagree about what it means to be "doing good [sic]" does not mean that Hubbs lied on the witness stand. Accordingly, plaintiffs fail to show that Hubbs displayed deliberate indifference to their constitutional rights.

### 7. *Monell* Claims

The *Monell* doctrine permits lawsuits against municipalities for "constitutional deprivations visited pursuant to governmental custom." *Monell v. Dept. of Social Services*, 436 U.S. 658, 690 (1978). To establish liability under *Monell*, a plaintiff must prove that (1) she was deprived of a constitutional right; (2) the municipality had a policy; (3) the policy amounted to a deliberate indifference to her constitutional right;

and (4) the policy was the "moving force behind the constitutional violation." *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835 (9th Cir. 1996). Therefore, a constitutional violation is a condition precedent to a viable *Monell* claim. *See, e.g.*, *Jackson v. City of Bremerton*, 268 F.3d 646, 653-54 (9th Cir. 2001) ("[n]either a municipality nor a supervisor, however, can be held liable under § 1983 where no injury or constitutional violation has occurred"). Because plaintiffs have failed to establish that defendants have violated their constitutional rights, their *Monell* claim fails.

### C.  **Intentional Infliction of Emotional Distress**

Plaintiffs claim that defendants are liable for intentionally inflicting emotional distress because they "conducted themselves with . . . reckless disregard" for their constitutional "rights and safety." Opp. Mot. Summ. J. at 29:21-22. As noted above, plaintiffs have failed to introduce evidence in support of this claim. The court thus grants summary judgment on plaintiffs' intentional infliction of emotional distress cause of action.

### III.  ORDER

For the foregoing reasons, the court grants defendants' motion for summary judgment.

DATED:     8/24/05                              /s/ Ronald M. Whyte

　　　　　　　　　　　　　　　　　　　　　　RONALD M. WHYTE
　　　　　　　　　　　　　　　　　　　　　　United States District Judge

1 **Notice of this document has been electronically sent to:**

2 **Counsel for Plaintiff(s):**
Robert R. Powell   rrplaw@earthlink.net

3

**Counsel for Defendant(s):**
4 Gregory J. Sebastinelli              gregory.sebastinelli@cco.co.scl.ca.us
Melissa R. Kiniyalocts              melissa.kiniyalocts@cco.co.scl.ca.us

5

6 Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:**      8/24/05                              DOH
                                              **Chambers of Judge Whyte**

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT—C-03-03767-RMW
DOH                                              19