**E-FILED on** ___6/5/09_____

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| LORI BELTRAN et al., | No. C-03-03767 RMW |
| Plaintiffs, | |
| v. | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION TO BIFURCATE TRIAL |
| COUNTY OF SANTA CLARA et al., | |
| Defendants. | **Re Docket Nos. 144 and 138** |
| | ~~[FILED UNDER SEAL]~~ |

Defendant social workers Melissa Suarez and Emily Tjhin move for summary judgment on the basis that they are entitled to qualified immunity for the actions they took in obtaining a protective-custody warrant authorizing the removal of minor plaintiff Coby Beltran from his parents, plaintiffs Robert and Lori Beltran.

Plaintiffs Beltran move to bifurcate the issues of liability and damages.

The court has reviewed the papers filed in connection with the motions and heard the parties' oral arguments. For the reasons set forth below, the court grants defendants' motion for summary judgment. Since the ruling on the summary judgment motion resolves the only liability issues that were still pending in this case, the motion to bifurcate is moot and, therefore, denied.

1            Judgment may now be entered in favor of defendants.

2                                   **I.  PROCEDURAL BACKGROUND**

3            On August 13, 2003 plaintiffs filed their complaint under 42 U.S.C. § 1983 for the alleged

4 violation of their civil rights and under state law for battery and intentional infliction of emotional

5 distress against defendants Suarez, Tjhin, Jennifer Hubbs, and the County of Santa Clara for the

6 removal and detention of four-year old Coby, the son of Lori and Robert Beltran.  On July 14, 2004,

7 this court granted in part and denied in part defendants' motion to dismiss plaintiffs' complaint.  It

8 ruled that Suarez and Tjhin had absolute immunity for their actions in connection with obtaining the

9 protective-custody warrant to remove Coby but that neither social worker had absolute immunity for

10 events allegedly occurring after Coby's detention, including the cessation of g-tube feedings and the

11 failure to inform Mr. and Mrs. Beltran of medical examinations and vaccinations, because "these

12 allegations do not implicate [defendants] in [their] quasi-prosecutorial role."  July 14 Order (Docket

13 No. 45).

14            Plaintiffs subsequently filed an amended complaint as permitted by the July 14 Order.

15 Defendants then filed a motion for summary judgment on all issues raised in the amended complaint

16 that survived the July 14 Order.  That motion was granted by Order dated August 24, 2005.  August

17 24 Order (Docket No. 102).  Judgment was entered on August 29, 2005.

18            Plaintiffs appealed from the judgment but raised only the issue of whether Suarez and Tjhin

19 were entitled to absolute immunity for their actions in connection with obtaining the protective-

20 custody warrant.  The court of appeals expressly identified the issue on appeal:

21       . . . the district court held that Suarez and Tjhin had absolute immunity for their
       actions connected to signing and filing dependency and custody petitions —
22        including the alleged fabrication of evidence and false statements. It therefore
       dismissed plaintiffs' claims that were based on the allegedly false petition statements.
23        The district court eventually granted summary judgment to the defendants on the
       remainder of plaintiffs' claims, but those issues are not before us, as plaintiffs appeal
24        only the dismissal of claims based on absolute immunity.

25 *Beltran v. County of Santa Clara,* 514 F.3d 906, 908 (9th Cir. 2008).  The court of appeals held *en*

26 *banc* that Suarez and Tjhin were not entitled to absolute immunity for their actions connected to

27 signing and filing dependency and custody petitions and remanded the question of their liability for

28

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION TO
BIFURCATE TRIAL—No. C-03-03767 RMW
AEA/TER               2

**United States District Court**
For the Northern District of California

1    that conduct back to this court. *Id.* at 908. Defendants Suarez and Tjhin now move for summary

2    judgment on the basis that they are entitled to qualified immunity for their actions.

3                                    **II. ANALYSIS**

4    **A.    Legal Standard**

5        In order to survive the motion by Suarez and Tjhin for summary judgment on the ground of

6    qualified immunity, the plaintiffs "must 1) make a 'substantial showing' of deliberate falsehood or

7    reckless disregard for the truth [connected to the signing and filing dependency and custody

8    petitions]; and 2) establish that, but for the dishonesty, the challenged action would not have

9    occurred." *Liston v. County of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997) citing *Harvey v. Estes*,

10   65 F.3d 784, 788-89 (9th Cir. 1995). At the summary judgment stage, the court, rather than a jury,

11   determines whether intentionally or recklessly omitted facts or deliberate or reckless falsehoods

12   were material. *Id.* In other words, if such omitted facts were included and such falsehoods excluded,

13   would the application for the protective custody warrant still support a finding of probable cause.

14   *See id.*

15   **B.    The Alleged Defects in the Warrant Application**

16       Plaintiffs contend that the following material facts were omitted from the warrant petition:

17              O - 1    Three prior referrals were deemed "unfounded." Ps' Opp. 14:3-14:7.

18              O - 2    That plaintiffs' use of multiple doctors, according to Mrs. Beltran, was caused

19                       by a change in insurance and Coby's multiple medical issues. *Id.* at 14:12-

20                       15:3.

21              O - 3    "Multiple doctors" referred to were all doctors within the Kaiser system. *Id.*

22                       at 14:13-14:20.

23              O - 4    Coby had multiple medical issues all of his life. *Id.* at 15:2-15:3.

24              O - 5    The Beltrans had significant medical bills. *Id.* at 15:4-15:18.

25              O - 6    Mrs. Beltran implemented a reward system that would have been used at

26                       Stanford. *Id.* at 15:19-16:4.

27              O - 7    Mrs. Beltran agreed to Coby's hospitalization at Lucile Packard Children's

28                       Hospital ("LPCH"). *Id.* at 16:5-16:20.

**United States District Court**
For the Northern District of California

1  O - 8 Dr. Durant chose to wait until the closing of escrow on the sale of the

2  Beltrans' house before commencing the procedures to admit Coby to LPCH.

3  *Id.* at 17:2-17:7.

4  O - 9 Mrs. Beltran received conflicting medical advice from Drs. Frank and Durant.

5  *Id.* at 17:15-18:10.

6  O - 10 Coby's intelligence and access to snacks and toys in the home was frequently

7  noted. *Id.* at 19:3-19:8.

8  O - 11 Coby gained weight since the installation of the g-tube. *Id.* at 19:10-19:15.

9  O - 12 The "reporter" named in paragraph b-1 and Dr. Frank referred to in paragraph

10  b-2 are the same person. *Id.* at 20:5-20:11.

11  O - 13 The referrant was the doctor that stated that Coby was in stable condition. *Id.*

12  at 20:12-20:20.

13  O - 14 Mrs. Beltran's incarceration for welfare fraud occurred ten years prior to the

14  proceedings at issue. *Id.* at 20:21-21:2.

15  O - 15 Mrs. Beltran and Coby missed only a couple of Coby's medical appointments

16  and doing so was the result of the Beltrans trying to sell their home. Mrs.

17  Beltran called in Coby's weight when she missed one appointment. *Id.* at

18  21:3-21:14.

19  O - 16 The affiant who signed the petition had not performed any investigation of her

20  own and did not have personal knowledge of anything in the warrant petition.

21  *Id.* at 21:15-21:24.

22  Further, plaintiffs claim that the following material misrepresentations were included in the

23  warrant petition:

24  M -1 Dr. Frank reported that Mrs. Beltran "does not provide Coby with appropriate

25  nutrition sufficient for growth." *Id.* at 22:5-22:11.

26  M -2 Coby had been "referred to psychiatry at Kaiser, but mother has not followed

27  through." *Id.* at 22:12-23:11.

28

M -3    The referant reported that the "mother might be keeping Coby in a state of illness in order to obtain community resources, and indicated that the mother had obtained money, computers and other resources by making false statements to community organizations regarding Coby's medical condition, and that funds and items were needed to assist with his care." *Id.* at 23:12-24:6.

M -4    Dr. Abramson said that "the mother has taken Coby to a number of doctors including an Ear, Nose and Throat doctor," and that "the mother pressured doctors into doing procedures on Coby." *Id.* at 24:8-24:20.

M -5    "[T]he mother stated in Coby's presence that Coby was dying." *Id.* at 24:21-24:23.

M -6    "[T]he mother was required to sign a contract . . . as the mother's behavior interfered with Coby's treatment." *Id.* at 25:1-25:13.

M -7    Mrs. Beltran said that the Beltrans had extensive medical bills, when Kaiser staff advised Suarez that most of Coby's care was covered by Kaiser.  *Id.* at 25:14-26:2.

M -8    Mrs. Beltran told Suarez that they were moving to Modesto because they were losing their home due to Coby's medical expenses and to find a new doctor for Coby.  *Id.* at 26:3-26:13.

M -9    Mr. Beltran had been present at Kaiser when Mrs. Beltran interfered but did not intervene and that Mr. Beltran failed to protect Coby from Mrs. Beltran. *Id.* at 26:20-26:24.

**C.      The Revised Warrant Application**

The court will first, for analysis purposes only, assume that the alleged omissions should have been included and the alleged misrepresentations excluded.  There is, however, a lack of a "substantial showing" that the social workers deliberately misled the court or acted with a reckless disregard for the truth.  However, with the assumptions made for analytical purposes, the court has

1  prepared the following revision of Tjhin's declaration by adding the alleged omissions in italics and

2  striking the alleged misrepresentations:

b-1  On or about 7-9-02, the Santa Clara County Department of Family and Children's Services (DFCS) received a report from a medical professional alleging General Neglect of Coby Beltran, age 4, by his mother, Lori Beltran. The reporter alleged that the mother has a history of taking Coby to multiple doctors *within the Kaiser system* [O - 3] for treatment of various medical conditions from which the mother thinks Coby suffers.   The reporter indicated a medical concern in that the mother has failed to follow medical advice and, has failed to bring Coby to medical appointments. ~~and does not provide Coby with appropriate nutrition sufficient for growth~~ [M - 1]. *The reporter also noted that Coby is in stable condition* [O - 13] *and that although the mother has missed a couple appointments, she said it was due to the family's house being sold and she called in Coby's weights* [O -15]. ~~The reporter stated a further concern that the mother might be keeping Coby in a state of illness in the home in order to obtain community resources, and indicated that the mother had obtained money, computers and other resources by making false statements to community organizations regarding Coby's medical condition, and that funds and items were needed to assist with his care~~ [M - 3] ;

b-2  *Further, upon investigation, the investigating Social Worker learned that there have been three prior referrals of the mother to DFCS all related to medical care and interactions with doctors.   These claims resulted in unfounded dispositions* [O -1]. ~~Further,~~ *Also,* upon investigation, the investigating Social Worker spoke with various physicians and learned that Coby's low weight is a medical concern, ~~and~~ that Coby suffers from constipation, which causes him to feel full and thus to have poor appetite, so that he is eating insufficiently, *and that Coby has had multiple medical issues all of his life* [O -4].  *Further, Coby's intelligence and access to snacks and toys in the home has been frequently noted* [O -10].  On or about 8-1-02, Suzanne Frank, MD (Pediatrician and Primary Care Physician), of Kaiser Permanente, *who is also the reporter referred to above in paragraph b-1,* [O - 12] indicated to the Social Worker that at the last meeting with the mother on 7-20-02, she had told the mother to stop using the feeding tube (which had been inserted in Coby's stomach), and that the mother should feed Coby by mouth, and bring Coby in two times per week to monitor Coby's weight; the mother reportedly agreed to this, but then changed to a new primary care physician through Kaiser in Modesto (name unknown), but according to computer records, she had not made an appointment with the new primary care physician.  Dr. Frank expressed concern that the mother had not followed up on her medical advice, and that Coby could be at risk for malnutrition if the mother did not follow instructions.  Dr. Frank also noted that she has not been able to rely upon information from the mother about Coby.  *There was evidence that Coby was gaining weight since the installation of the G-tube* [O - 11] *and that the mother received conflicting medical advice regarding whether to keep the G-tube in from Drs. Frank and Durant* [O -9]. *Further, the mother implemented a reward system that would have been used at Stanford Hospital* [O - 6] *and the mother agreed to hospitalizing Coby at Lucille Packard Children's Hospital* [O - 7];

b-3  *Further, the mother indicated that the family changed insurance carriers, which resulted in use of multiple doctors.* [O -2]

1

2     b-3     ~~Further, the mother stated in Coby's presence that Coby was "dying"; [M -~~

3     ~~5]~~

4     b-4     Further, Coby exhibits aggressive behavior toward the mother in that Coby
              reportedly bites, hits and beats on the mother.   Dr. Mike Durant,
              Gastroenterologist, indicated to the investigating Social Worker on or about
5             8-7-02 that the mother reported the child's behavior to be uncontrollable.
              The child has been observed acting aggressively toward the mother by the
6             current investigating Social Worker, as well as a prior investigating Social
              Worker. ~~Reportedly, the child has been referred to Psychiatry at Kaiser, but~~
7             ~~the mother has not followed through.~~ [M - 2];

8     b-5     Further, according to Dr. Oren Abramson, Gastroenterologist at Kaiser, the
              mother's mental health issues, as well as the mother's failure to provide
9             accurate information to care providers, interfered with the child's medical
              care.  ~~Dr. Abramson indicated that the mother has taken Coby to a number~~
10            ~~of doctors in order to try to find a problem, including an Ear, Nose and~~
              ~~Throat doctor.  Dr. Abramson stated that the mother pressured doctors into~~
11            ~~doing procedures on Coby~~ [M - 4];

12    b-6     ~~Further, the mother was required by Kaiser to sign a contract (attached) on~~
              ~~or about 4-20-02, when Coby was hospitalized, as the mother's behavior~~
13            ~~interfered with Coby's treatment.~~ [M - 6];

14    b-7     Further, on or about 8-7-02, Dr. Mike Durant, Gastroenterologist, indicated
              to the Social Worker that the child needed to be away from his mother in
15            order to learn to eat and eliminate normally.  Dr Durant likened the child's
              condition to "psychosocial dwarfism," stating that the mother lacked the
16            skills to care for the child, and that the child suffered from severe fecal
              withholding with secondary encopresis;

17

18    b-8     ~~Further, the mother has solicited money for Coby's medical care on the~~
              ~~internet by representing that Coby has extensive medical expenses, when~~
              ~~Kaiser staff advise that most of Coby's care is covered by Kaiser.~~ [M - 3 and
19            M - 7] *Further, the mother reported that the family had significant medical
              bills* [O - 5];

20

21    b-9     Further, the mother previously self disclosed to a Social Worker that she was
              jailed for welfare fraud *in 1992* [O - 14], although the mother indicated that
22            the charge was bogus;

23    b-10    ~~Further, on or about 7-19-02, the mother told the investigating Social Worker~~
              ~~that the family was moving to Modesto because they were losing their house~~
              ~~due to Coby's medical bills, and in order to find new doctors for Coby;~~ [M -
24            8]

25    b-11    Further, Dr. Durant reported to the investigating Social Worker on or about
              8-7-02, that the mother had informed him that escrows were to close on the
26            house they were buying and the house they were selling within eight days.
              *Dr. Durant chose to wait until the closing of escrow on the sale of the
27            Beltran's house before commencing the process of admitting Coby into
              Lucille Packard Children's Hospital* [O -8];

28

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1

b-12 ~~Further, the father has reportedly been present at Kaiser when the mother has interfered with Coby's care, but has not intervened;~~ [M - 9]

2

3

b-13 ~~Further, the father failed to protect Coby from the mother.~~ [M - 9]

4

b-14 *The undersigned has not performed the investigation leading to these assertions. The investigation was performed by social worker Melissa Suarez and the undersigned Social Work Supervisor Tjhin has reviewed this petition.* [O -15]

5

6

7

**D.    Analysis**

8

**1.    Sufficiency of Warrant Assuming Additions and Deletions Made as Plaintiffs Propose**

9

The warrant petition was filed on August 12, 2002 by Emily Tjhin, a social worker

10 supervisor, on behalf of the Santa Clara County Social Services Agency, following the investigation

11 by social worker Melissa Suarez of a report of suspected child abuse involving Coby Beltran.  The

12 referral was  received on July 9, 2002 from Suzanne Frank, M.D., a pediatrician and primary care

13 provider at the Santa Clara Kaiser hospital.  Plaintiffs claim that the petition included material false

14 representations and omitted other material information.  Plaintiffs contend that if the false

15 representations were removed and the omitted  facts were included, the petition would fail to support

16 probable cause for the issuance of a warrant.  The court disagrees.

17 Even if the allegedly false statements were removed and the allegedly material omissions

18 included, the resulting petition would nevertheless support probable cause to suspect that Coby had

19 suffered, or there was a substantial risk that he would suffer, serious physical harm or illness.  *See*

20 Cal. Wel. & Inst. Code § 300(b).  The revised petition would still show that Suzanne Frank, M.D.

21 made a report of suspected child abuse to the County's Child Protective Services pursuant to Cal.

22 Penal Code § 11166.  She reported a concern that her patient Coby, age 4, was not being properly

23 cared for in that Coby's mother was not providing reliable information about Coby and not following

24 her instructions and that Coby had a number of medical issues.  The revised petition would also

25 reflect that during Suarez's investigation, Mike Durant, M.D., a gastroenterologist at Kaiser, advised

26 that Coby's mother had reported Coby's behavior as uncontrollable.  Coby bit, hit and beat on his

27 mother.  Dr. Durant indicated that Coby needed to be "removed from his mother in order to learn to

28

**United States District Court**
For the Northern District of California

1   eat and eliminate normally," and likened Coby's condition to "psychosocial dwarfism," and stated

2   that his mother "lacked the skills to care for the child."

3       The revised petition would also still show that Oren Abramson, M.D., also a

4   gastroenterologist, reported that the mother's mental health issues, as well as her failure to provide

5   accurate information to care providers, interfered with Coby's medical care.  He expressed concern

6   for Coby's health because of his mother's interference with medical care and noted that his mother

7   fails to provide accurate information about Coby.

8       The surviving assertions support a finding that there was probable cause to believe that Coby

9   had suffered, or there was a substantial risk that he would suffer, serious physical harm or illness if

10   not removed pending a detention hearing and, if detained, until a jurisdictional hearing.

11                       **2.  Plaintiffs' Proposed Additions Are Incomplete**

12       Plaintiffs offer what they claim should have been included but was not.  However, to be fair,

13   the alleged omissions need to be put in context and made complete.  If that is done, the resulting

14   picture is not significantly different than what was presented.

15       A few examples illustrate how the alleged material omissions are out of context and

16   incomplete.

17                       **a.  Prior Unfounded Referrals**

18       Plaintiffs contend that the information related by Drs. Frank, Durant and Abramson is

19   misleading without also advising the court that several similar referrals had been made in the past by

20   others and that those had been closed as unfounded.  The inference plaintiffs seek to draw is an

21   unreasonable one.  One cannot reasonably infer from the fact that prior similar complaints about

22   abuse of Coby had been closed as unfounded that all subsequent complaints would also be without

23   foundation, particularly in light of the conclusion of the referral immediately prior to the one that is

24   the subject of this dispute.  That referral included a statement that a further referral would be made if

25   new concerns arose.  Thus, if the conclusion of the preceding referral was included along with the

26   information that plaintiffs contend should have been included, the issuing judge would have been

27   advised:

28

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION TO
BIFURCATE TRIAL—No. C-03-03767 RMW
AEA/TER

1
2
3
4

> Coby Beltran did present objective indicators of minimal weight gain, constipation, and hyperactivity while hospitalized. This occurred under close hospital supervision, and with contact limited to first only the father, and then the mother. *At this time, although the mother's interaction with her child continues to be of an anxious nature, there is no confirmation that she has significantly misrepresented symptoms or induced illness in the child. Kaiser Hospital will refer to DPS if new concerns arise.* Close referral as allegations unfounded.

5   Decl. of Robert Powell, Ex. D8 (emphasis added). This information would have told the issuing

6   judge that although prior concerns over misrepresented symptoms or induced illness had not been

7   confirmed, the hospital was now advising of new concerns. Thus, in the context of the most recent

8   referral stating that the hospital would make a further referral if new concerns arose, information that

9   prior similar referrals had been closed as unfounded, does not give rise to an inference that such new

10  referrals would also be unfounded. If anything, within the context provided by the most recent

11  referral, the additional information that there had been prior similar but unfounded concerns would

12  have most likely caused the issuing judge to have greater suspicion that Coby was at risk of harm or

13  illness than he otherwise would have had if there had been no prior referrals.

14
**b. Lack of First Hand Knowledge by Social Worker Applicant**

15          Plaintiffs "submit one of the single most significant material omissions in presenting the

16  Warrant Petition is the fact that the affiant who signed the petition, Tjhin, had not performed any

17  investigation of her own whatsoever, and that for not a single thing in the Warrant Petition did she

18  have personal knowledge." Ps' Opp. at 21:15-18. This alleged omission is not significant,

19  particularly if a full explanation of the process of preparing the petition had been included and not

20  just plaintiffs' partial addition. First, the petition specifically says "1. Petitioner *on information and*

21  *belief* alleges the following:" Ds.' Mot., Ex. X (emphasis added). Therefore, based upon that

22  introduction and the contents of the application itself, it would have been clear that the facts alleged

23  were based primarily, if not exclusively, on information provided by others. Second, if complete

24  information surrounding the preparation of the petition had been included and not just the portion

25  plaintiffs suggest, the issuing judge would have known that Suarez presented the investigation at a

26  staff meeting in which a deputy county counsel and Tjhin, a social worker supervisor, participated

27  and a decision was made to seek the warrant. *Id.* at Ex. B at 38:23-39:22. The issuing judge would

28  thus have known that the petition was filed only after presentation to a supervisor and a deputy

1   county counsel thus relieving any concern that the petition was based upon the unreviewed decision

2   of a single individual social worker.

### c.  Omission of Mrs. Beltran's Alleged Willingness to Implement Reward System

Plaintiffs contend that the warrant petition should have stated that Mrs. Beltran implemented a reward system that would have been used had Coby been admitted at Stanford Hospital as recommended by Dr. Durant.  The program that Dr. Durant wanted for Coby involved admitting him into the hospital for two weeks and limiting his contact with Mrs. Beltran while he learned to eat and eliminate.  *Id.* at Ex. M at 7.  Moreover, there is no evidence that Dr. Durant asked Mrs. Beltran to implement any program on her own.  In fact, a full report of what Dr. Durant said would have included his statement to Suarez that Mrs. Beltran misreported information to him.  *Id.* at 3.

### d.  Omission of Mrs. Beltran's Agreement to Hospitalization at Stanford

Additionally, plaintiffs contend that the warrant petition should have included that Mrs. Beltran had agreed to the Stanford hospitalization and the required separation from Coby; that although Dr. Durant indicated that Coby needed to be away from his mother in order to eat and eliminate normally, the separation did not require that he be removed from his mother; and that Dr. Durant told Suarez on August 2, 2002 that he was going to wait until plaintiffs moved to Modesto before having Coby admitted into the hospital.  This proposed addition leaves out significant information that Dr. Durant provided Suarez after their August 2, 2002 conversation.  On August 7, 2002, one week before Suarez obtained the warrant, Dr. Durant informed her that the psychiatric ward at Stanford was closed.  *Id.* at Ex. M at 4.  Dr. Durant did not suggest to Suarez any alternative hospitals that offered a similar program but emphasized that Coby needed to be away from his mother to learn to accomplish the goal of proper feeding and eliminating, that Coby's problem was "absolutely" behavioral, and that it would not get better under his mother's supervision. *Id.*  The failure to mention the unavailability of Stanford hospitalization in the warrant petition seems relatively inconsequential and, if it had been included with full context, would not have negated probable cause.

**United States District Court**
For the Northern District of California

**e. Coby's Alleged Intelligence and Access to Snacks and Toys**

Plaintiffs contend that Coby's alleged intelligence and access to snacks and toys were material omissions from the warrant petition because they allegedly showed "evidence of a well-parented, well-provided for little boy." Ps' Opp at 19:3-8.  If this omission had been added, it would have been misleading without other information concerning Coby's relationship with his mother.  That relationship, as reported by the doctors is discussed above.  In addition, during Suarez's investigation of the referral that is the subject of this action, she observed Coby pick up a toy and throw it at his mother and then pick up the container for the toy and throw it at Suarez.  Ds' Mot., Ex. M at 8.  It seems doubtful that this information about intelligence and access to snacks and toys would have ameliorated the issuing judge's concern about Coby's relationship with his mother and his uncontrollable conduct.

**f. Failure to Take Coby to Medical Appointments with Dr. Frank**

Plaintiffs assert that the warrant petition should have stated that Coby only missed a couple of appointments with Dr. Frank and that these occurred only because plaintiffs were in the middle of moving.  However, this proposed addition does not appear accurate.  Dr. Frank reported to Suarez on August 1, 2002 that the last time she saw Coby and Mrs. Beltran was on July 20, 2002, at which time Mrs. Beltran agreed to bring Coby in for an appointment twice per week to check on his weight.  Ds' Mot., Ex. M at 6.  Thus, when Dr. Frank provided this information to Suarez twelve days had passed, and Coby had apparently missed at least three appointments.

**2. Plaintiffs' Alleged Misrepresentations**

If a substantial showing is made that an application contains deliberate falsehoods or statements made with a reckless disregard for the truth, the question of intent or recklessness is a factual determination for the jury.  *Liston*, 120 F.3d at 974.  Here, however, plaintiffs have failed to make the threshold substantial showing that defendants Suarez and Tjhin made deliberately false statements.  Plaintiffs' papers tend to blur the distinction between statements that are made that turn out to be incorrect or inaccurate and statements that are deliberately false or made with a reckless disregard of the truth.  The court examines below several of the alleged misrepresentations and finds

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION TO BIFURCATE TRIAL—No. C-03-03767 RMW
AEA/TER

12

evidence lacking that they were deliberate falsehoods or made with reckless disregard for truth.

### a. Dr. Frank Reported That Mrs. Beltran Does Not Provide Coby with Appropriate Nutrition Sufficient for Growth

Plaintiffs contend that the statement in paragraph b-1 of the warrant petition that Dr. Frank reported that Mrs. Beltran did not provide Coby with appropriate nutrition sufficient for growth was deliberately false. Dr. Frank, however, reported on at least three separate occasions that Coby was at risk of malnutrition. First, when Dr. Frank made the suspected child-abuse referral on July 9, 2002, she expressed concern that Mrs. Beltran was not accurately reporting symptoms that impacted Coby's nutrition and was not bringing Coby in for appointments. Ds' Mot, Ex. M at 6; Ex. A at 26:12-28:6, 75:24-76:3; RJN, Ex. CC at 1664:10-1668:28. Although Dr. Frank's exact words may not have been that Mrs. Beltran failed to provide Coby with appropriate nutrition sufficient for growth, she was clearly concerned that such was the case. RJN, Ex. CC at 2239:17-2240:24; Ds' Mot., Ex. A at 75:24-76:3.

Second, the social worker from the Child Abuse and Neglect Hot Line that took the call from Dr. Frank wrote in his narrative that "[r]eferent said that the mother does not provide the minor with appropriate food anmalnurish [sic] causing the minor insufficient nutrients for growth." Ds' Mot., Ex. P.

Third, on August 1, 2002, Dr. Frank told Suarez that "if the mother quits feeding [Coby] with the tube and he is not eating he is at risk for serious malnutrition." *Id.* at Ex. M. Dr. Frank stated this after she informed Suarez that she told Mrs. Beltran to stop feeding Coby through the G-tube, try only oral feeding, and that Coby should be brought in for an appointment twice per week to check on his weight. *Id.* Mrs. Beltran agreed to comply with these orders during an appointment on July 20, 2002. *Id.* But at the time of Dr. Frank's telephone call to Suarez on August 1, 2002, Coby had not been brought Coby in for an appointment for twelve days. *Id.* This back-up information is inconsistent with a claim that the declaration in the warrant application contained a false statement by Tjhin about Mrs. Beltran not providing Coby with sufficient nutrition. No evidence supports an inference that Suarez or Tjhin deliberately misrepresented what Dr. Frank reported.

United States District Court
For the Northern District of California

### b. Coby Had Been Referred to Psychiatry at Kaiser, but Mother Has Not Followed Through

Plaintiffs contend that the allegation in the warrant petition that Coby had reportedly been referred to Psychiatry at Kaiser but that Mrs. Beltran had not followed through was "blatantly false." Ps' Opp. at 22:12-13.  But the evidence shows that Dr. Abramson told Suarez during their August 1, 2002 telephone conversation that the last he heard about the family was that they were referred to Psychiatry but that Mrs. Beltran failed to keep the appointment.  Ds' Mot., Ex. M at 6-7; Ex. G at 46:20-47:15.  Notably, plaintiffs do not dispute that Dr. Abramson provided Suarez with this information.  Further, Dr. Marina Zelenko, a child psychiatrist who saw Coby and his mother several times in 2001 and 2002, testified that on April 23, 2002 she saw Coby on an out-patient visit and a follow-up was scheduled for the following month.  The appointment was cancelled and Dr. Zelenko never saw Coby again.  Plaintiffs' contention seems to be not that the appointment was cancelled but that if Suarez had interviewed Dr. Zelenko she would have told Suarez that Coby's home life was not contributing to Coby's hyperactivity.  The fact that Coby's home life may not have been contributing to Coby's hyperactivity obviously does not make the statement that Coby had been referred to Psychiatry or that Mrs. Beltran had not followed through false.

### c. Mother Might Be Keeping Coby in a State of Illness in Order to Obtain Community Resources, and that the Mother Had Obtained Money, Computers and Other Resources by Making False Statements to Community Organizations Regarding Coby's Medical Condition, and That Funds and Items Were Needed to Assist with His Care.

Plaintiffs contend that the warrant petition falsely stated in paragraph b-1 that "the mother might be keeping Coby in a state of illness in order to obtain community resources, and indicated that the mother had obtained money, computers and other resources by making false statements to community organizations regarding Coby's medical condition, and that funds and items were needed to assist with his care."  Ps' Opp. at 23:12-16.  However, it is important to note that the statement in the warrant petition is prefaced by "[t]he *reporter stated* a further concern that the mother *might be keeping* Coby in a state of illness . . . ." (emphasis added).  The petition was therefore clear that Tjhin was only saying that the reporting party (Dr. Frank) was concerned that Mrs. Beltran *might* be

**United States District Court**
For the Northern District of California

1   doing this, not that the social workers knew this or that the reporting party was saying that it was

2   other than a possibility.

3        The evidence shows that Tjhin accurately summarized what Dr. Frank had said with respect

4   to the possibility that Mrs. Beltran was keeping Coby in a state of illness.  In the Suspected Child

5   Abuse Report, which Dr. Frank herself completed, she stated concerns that Mrs. Beltran might be

6   exaggerating Coby's symptoms for financial gain:

> Mother not complying with medical care.  This leads to unnecessary treatments and
> interferes with the development of the child.  Mother using malingering behavior and
> exaggerating Sx [symptoms] of the child for probable financial gain.  Mother
> continuously gives conflicting stories about child's care and condition to various
> health care team members.  This interferes with care.  Mother does not bring in child
> for f/u [follow-up] care.

10  RJN, Ex. A-1.

11       Dr. Frank also expressed similar concerns when she called the Child Abuse and Neglect Hot

12  Line:

> The mother might be keeping the minor ill to obtain resources from community
> organizations.  Referent said that the mother has solicited money, computers, and
> other resources from [the] community by making false statements to organizations
> that the minor is very ill and that they need funds and things to assist with his caring
> [sic]. Referent said that the mother then turns around and sells donated items on
> Ebay for profit.

17  Ds' Mot., Ex. P.

18       Dr. Frank reported on August 1, 2002, during a telephone conversation with Suarez,

19  that she thought Mrs. Beltran kept Coby sick in order to make money for herself and that the

20  Sheriff's Office was investigating possible internet fraud regarding the mother.  *Id.*, Ex. M at 6.)

21       Plaintiffs do not dispute that this information was received from Dr. Frank.  Further, Tjhin's

22  declaration only states that the matter was reported as a possibility and makes no representation that

23  it was, in fact, true or that Dr. Frank's concern about the possibility that Ms. Beltran was deliberately

24  keeping Coby ill or using questionable means to raise funds for his care had been investigated or

25  verified.  Tjhin's declaration was neither false nor made recklessly.

26           **d.  The Mother Has Taken Coby to a Number of Doctors Including an Ear,
              Nose and Throat Doctor and Has Pressured Doctors into Doing**

27                **Procedures on Coby**

28       Plaintiffs contend that the statements in paragraph b-5 of the warrant petition that "Dr.

1   Abramson indicated that the mother has taken Coby to a number of doctors in order to try to find a

2   problem, including an Ear, Nose and Throat doctor" and that Dr. Abramson stated that "the mother

3   pressured doctors into doing procedures on Coby" are both lies.  Ds' Opp. at 24:8-16.  The evidence,

4   however, shows that these statements were made to Suarez.

5        On August 1, 2002, Dr. Abramson returned a call from Suarez and stated that although he

6   had inserted the G-tube he now felt it was unnecessary and wanted to take it out. Ds' Mot., Ex. M at

7   7.  Dr. Abramson stated that Mrs. Beltran went to a variety of doctors trying to find something

8   wrong with Coby.  Dr. Abramson reported that Mrs. Beltran "went to the ENT [Ear, Nose, and

9   Throat] stating that there were problems, but that they felt that she was forcing them into

10  procedures." *Id.*  Thus, there is evidentiary support for the statement in the warrant petition that Mrs.

11  Beltran took Coby to a number of doctors in order to try to find a problem and pressured doctors into

12  doing procedures on Coby.

13              **e**.  **The Mother Stated in Coby's Presence that Coby Was Dying**

14       Plaintiffs argue that the statement in paragraph b-3 of the warrant petition that Mrs.

15  Beltran stated in Coby's presence that he was dying is false.  However, they ignore the information

16  Suarez had.  Specifically, Dr. Frank was concerned that Mrs. Beltran portrayed Coby as dying.  *Id.,*

17  Ex. A at 51:15-52:7.  On July 9, 2002, the same day that Dr. Frank made the suspected child-abuse

18  referral, she spoke with a hospital employee who told her that she was helping a little boy who

19  was very ill and possibly dying.  RJN, Ex. CC at 1827:15-1830:16.  Mrs. Beltran admitted that she

20  may have said that she was not going to sit and watch Coby die in response to Dr. Frank telling her

21  to stop feeding Coby through his G-tube.  RJN, Ex. Z 9/3/02 Addendum Report.

22              **f.**  **The Mother Was Required to Sign a Contract as the Mother's Behavior
               Interfered with Coby's Treatment**

23

24       Plaintiffs contend that the statement in paragraph b-6 of the warrant petition regarding the

25  contract Kaiser required Mrs. Beltran to sign during one of Coby's hospitalizations was only

    "partially accurate." Ps' Opp. at 25:1.  Plaintiffs contend that Mrs. Beltran disagreed with the

26  contract and signed it under duress but that the warrant petition did not state this. *Id.* at 25:2-13.  The

27  fact that the warrant petition did not state that Mrs. Beltran claims she signed the contract under

28

duress overlooks the relevance of contract.  It shows the concern the hospital staff had regarding

Mrs. Beltran's interference with Coby's care.  Mrs. Beltran was not to harass or intimidate the

nursing staff, was required to bring her concerns in writing to a nurse manager, was not to interfere

with the care by nursing staff, was to maintain an acceptable noise level so as not to interfere with

other patients, was to comply with the routine of the ward, and was to keep psychiatric

appointments. Decl. of Lori Beltran, Ex. 1.   The representation in the warrant petition was neither

false nor recklessly made.

> **g.  Mr. Beltran Had Been Present at Kaiser When Mrs. Beltran Interfered but Did Not Intervene and Mr. Beltran Failed to Protect Coby from Mrs. Beltran**

Plaintiffs contend that the allegations in paragraphs b-12 and b-13 in the warrant petition

that Mr. Beltran was present at Kaiser when Mrs. Beltran interfered with Coby's medical care and

did not intervene were false. Ps' Opp. at 26:14.  Plaintiffs do not dispute that Mr. Beltran was present

at Kaiser and did not intervene but claim that "the undisputed fact he didn't intervene was

attributable to the fact there was nothing to 'intervene' about." *Id.* at 26:16-18.  Plaintiffs may be

correct that there was no need to interfere.  However, that argument ignores the significance of the

evidence.  The evidence was presented to show that the doctors and staff at Kaiser had concerns

about Mr. Beltran's failure to take any control.  For example, Dr. Durant told Suarez that he met Mr.

Beltran when he performed a biopsy on Coby's intestine, and that Mr. Beltran was "not even a verbal

presence."  Ds' Mot., Ex. M at 4-5; Ex. F at 13:4-13.  Dr. Durant testified that Mr. Beltran "was

surprisingly absent emotionally and mentally" at the appointment where Coby had the biopsy.  RJN,

Ex. FF at 2080:18-21.  He did not ask any questions nor appear to have any concerns about the

procedure, which was a "life-threatening procedure." *Id.* at 2080:26-2081:6.

Dr. Frank testified during the dependency trial that on three occasions prior to Coby's

removal Mr. Beltran attended medical appointments with Coby and his mother.  RJN, Ex. CC at

2327:13-27.  Mr. Beltran was minimally involved in the discussions about Coby's treatment. *Id.*

During the appointment that followed Dr. Frank's referral, Mrs. Beltran became upset about the

referral, yelled at Dr. Frank using foul language, told her to call DFCS and say the referral was a

mistake, and threatened to sue her.  *Id.* at 2329:6-2331:7.  Dr. Frank was concerned about the

*United States District Court*
For the Northern District of California

United States District Court
For the Northern District of California

1   escalation of the situation and called security to intervene.  *Id.* at 2332:9-14.  Mr. Beltran, however,

2   left the examination room before security arrived.  *Id.* at 2365:2-19.  Moreover, during Coby's

3   hospitalization in April 2002 hospital staff asked Mrs. Beltran to sign a contract to refrain from

4   interfering with Coby's care.  *Id.*, Ex. M at 8.  The Nurse Manager for Pediatrics and Pediatric

5   Intensive Care Unit at Kaiser Santa Clara who was present when Mrs. Beltran was asked to sign the

6   contract reported that hospital staff asked her to sign the contract because of her interference in the

7   nursing care.  RJN, Ex. Z at 4:6-12.  The Nurse Manager reported that Mr. Beltran "back[ed] mom

8   100%" and did not attempt to intervene when Mrs. Beltran's behaviors were disruptive to Coby's

9   care. *Id.*  Mr. Beltran did not even know that hospital staff required Mrs. Beltran to sign the contract.

10  *Id.*, Ex. H, at 65:2-10.  Suarez was concerned that Mr. Beltran's passivity placed Coby at risk

11  because Mr. Beltran was unable to stand up to his wife.  *Id.* at 121:12-16.  Moreover, despite DFCS's

12  prior investigations, concerns about risk to Coby were still being reported by multiple doctors.  *Id.* at

13  122:3-6.

### h.  Miscellaneous Allegedly False Statements

15      Plaintiffs take issue with statements in the warrant application in addition to those discussed

16  above.  These deal with, among other things, whether the Beltrans had extensive medical bills and

17  whether they were moving to Modesto for financial reasons.  These statements, if examined, have

18  little relevance to the probable cause determination.  However, Tjhin had an adequate basis for them

19  and there is no evidence that they were deliberate falsehoods or statements with reckless disregard of

20  the truth.

### III.  CONCLUSION

22      Tjhin and Suarez are entitled to qualified immunity for their actions connected to the signing

23  and filing of the dependency and custody petitions involving Coby Beltran.  Plaintiffs' claim that

24  Tjhin and Suarez are not entitled to qualified immunity fails on many levels.  First, even if the

25  protective-custody warrant application had the allegedly offending statements removed and the

26  allegedly omitted information added, the application would still have supported probable cause for a

27  warrant.  Second, Tjhin and Suarez had support for the information submitted to the issuing judge

28  and the allegedly omitted information would not have benefitted plaintiffs if presented in context

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION TO
BIFURCATE TRIAL—No. C-03-03767 RMW
AEA/TER                                          18

1  and in a fair and complete way.  Third, plaintiffs have failed to make a threshold showing that

2  Suarez and Tjhin deliberately or recklessly presented false information to the court or deliberately or

3  recklessly omitted material information.  Defendants Suarez and Tjhin are entitled to qualified

4  immunity.

5      The granting of defendants' motion resolves the only remaining liability issues in this case

6  and judgment may be entered in favor of defendants.

7

8                              **IV.  ORDER**

9      For the foregoing reasons, the court grants defendants' motion for summary judgment.

10  Plaintiffs' motion to bifurcate is denied as moot.

11

12

13

14  DATED:  _____6/3/09_____            _Ronald M Whyte_____

15                                          RONALD M. WHYTE
                                            United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION TO
BIFURCATE TRIAL—No. C-03-03767 RMW
AEA/TER                                    19

**United States District Court**
For the Northern District of California

1  **Notice of this document has been electronically sent to:**

2  **Counsel for Plaintiffs:**

3  Robert Ross Powell                    rpowell@rrpassociates.com

4  Dennis R. Ingols                      dingols@rrpassociates.com

5
6  Douglas D. Durward                    Doug@durwardlaw.com

7
8  **Counsel for Defendants:**

9  Melissa R. Kiniyalocts                melissa.kiniyalocts@cco.co.scl.ca.us

10  Gregory Joseph Sebastinelli           gregory.sebastinelli@cco.co.scl.ca.us

11  Counsel are responsible for distributing copies of this document to co-counsel that have not
registered for e-filing under the court's CM/ECF program.

12

13

14  **Dated:**   6/5/09                             TER
                                          **Chambers of Judge Whyte**

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION TO
BIFURCATE TRIAL—No. C-03-03767 RMW
AEA/TER                                    20